FILED
**United States Court of Appeals**
**Tenth Circuit**

**June 27, 2017**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

| | |
|---|---|
| THE FOURTH CORNER CREDIT UNION, a Colorado state-chartered credit union, | |
| Plaintiff - Appellant, | |
| v. | No. 16-1016 |
| FEDERAL RESERVE BANK OF KANSAS CITY, | |
| Defendant - Appellee. | |
| ------------------------------ | |
| BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, | |
| Amicus Curiae. | |

_____

**Appeal from the United States District Court**
**for the District of Colorado**
**(D.C. No. 1:15-CV-01633-RBJ)**
_____

Mark A. Mason, The Mason Law Firm, P.A., Mount Pleasant, South Carolina (Gabrielle Z. Lee, The Mason Law Firm, P.A. Mount Pleasant, South Carolina, with him on the briefs), for Plaintiff-Appellant.

Scott S. Barker, Wheeler Trigg O'Donnell LLP, Denver, Colorado (N. Reid Neureiter and Benjamin I. Kapnik, Wheeler Trigg O'Donnell LLP, Denver, Colorado, with him on the brief), for Defendant-Appellee.

Scott G. Alvarez, General Counsel; Richard M. Ashton, Deputy General Counsel; Katherine H. Wheatley, Associate General Counsel; Yvonne F. Mizusawa, Senior

Counsel, Board of Governors of the Federal Reserve System, Washington, D.C., filed an amicus brief for Amici Curiae, the Board of Governors of the Federal Reserve System.

_____

Before **MATHESON**, **BACHARACH**, and **MORITZ**, Circuit Judges.

_____

**PER CURIAM**

In this appeal, we vacate the district court's order and remand with instructions to dismiss the amended complaint without prejudice. This disposition is addressed in three opinions—one by each member of the panel. Judge Moritz would affirm the dismissal with prejudice. Judge Matheson would vacate and remand with instructions to dismiss the amended complaint without prejudice on prudential-ripeness grounds. Judge Bacharach would reverse the dismissal of the amended complaint. By remanding with instructions to dismiss the amended complaint without prejudice, our disposition effectuates the judgment of the two panel members who would allow the Fourth Corner Credit Union to proceed with its claims.

Finally, we deny the Federal Reserve Bank of Kansas City's motion to strike the Fourth Corner Credit Union's reply-brief addenda.

_____

**MORITZ**, Circuit Judge.

_____

The Fourth Corner Credit Union applied for a master account from the Federal Reserve Bank of Kansas City. The Reserve Bank denied the application, effectively crippling the Credit Union's business operations. The Credit Union sought an injunction requiring the Reserve Bank to issue it a master account. The district court

dismissed the action, ruling that the Credit Union's raison d'être—to provide banking services to marijuana-related businesses—would violate the Controlled Substances Act (CSA), 21 U.S.C. §§ 801-904. Because the district court correctly declined to lend its equitable power to illegal activity, I would affirm the dismissal with prejudice.[1]

## BACKGROUND

In 2012, Colorado amended its constitution to legalize a wide array of recreational marijuana activity. *See* COLO. CONST. art. XVIII, § 16. An industry of marijuana growers and retailers sprang up to supply this new market, but they face a significant obstacle: traditional banks are wary of serving marijuana-related businesses (MRBs). Many MRBs thus operate solely in cash, a restriction that "raise[s] significant public safety concerns for customers and employees" and "make[s] it more difficult for the state and federal government to regulate and audit [MRBs]." App. 215.

The Credit Union aims to fill this banking void. Its purpose, according to its amended complaint, is to "provide much needed banking services to compliant, licensed cannabis and hemp businesses" and to marijuana-legalization supporters. *Id*. at 219. But there are many hurdles for a would-be depository institution to clear. The relevant hurdle here is obtaining a master account. A master account is, put simply, a bank account for banks. It gives depository institutions access to the Federal Reserve

---

[1] For the reasons stated by Judge Bacharach in his separate opinion, I conclude that this matter is ripe for resolution. *See* Op. of J. Bacharach, J., 28-38.

System's services, including its electronic payments system. In the Credit Union's words, "Without such access, a depository institution is nothing more than a vault." *Id.* at 225.

The Credit Union applied to the Federal Reserve Bank of Kansas City for a master account.[2] The Reserve Bank denied the application by letter, citing a host of concerns. In general, the Reserve Bank determined that the Credit Union simply posed too great a risk to the Federal Reserve System—in large part because of its "focus on serving [MRBs]."[3] *Id.* at 78.

In response, the Credit Union filed this suit. It sought a declaratory judgment that the Credit Union is entitled to a master account and an injunction requiring the Reserve Bank to issue it one. The Credit Union asserted that the Reserve Bank is required by statute to issue a master account to every applicant, citing 12 U.S.C. § 248a. The Reserve Bank moved to dismiss the complaint, arguing that (1) the Reserve Bank retains statutory discretion to deny master-account applications; (2) the district court couldn't use its equitable power to facilitate illegal activity—namely, violations of the CSA; and (3) the Credit Union's Colorado charter is preempted and void under the Supremacy Clause because it conflicts with the CSA. In apparent

---

[2] The Credit Union has one alternate path to access the Reserve Bank's services: establishing a correspondent relationship with a financial institution that already has a master account. But at oral argument in the district court, counsel for the Credit Union asserted that it tried and failed to secure a correspondent relationship.

[3] Because the Credit Union quoted from the denial letter in its pleadings, and the letter is central to its claim, this court may consider it when reviewing the Reserve Bank's motion to dismiss. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997).

response to the Reserve Bank's illegality argument, the Credit Union amended its complaint. In its amended complaint, the Credit Union repeatedly alleges that it will serve MRBs only if it's authorized to do so by law. The Credit Union then moved for summary judgment on its claim, and the Reserve Bank renewed its motion to dismiss.

The district court granted the Reserve Bank's motion to dismiss and denied the Credit Union's motion for summary judgment. The district court didn't accept the Credit Union's allegations that it would follow the law. And based on the principle that "courts cannot use equitable powers to issue an order that would facilitate criminal activity," App. 707, the district court concluded that it couldn't grant the Credit Union its requested injunction. The district court declined to reach the Reserve Bank's preemption and statutory discretion arguments.

The Credit Union filed a motion for reconsideration requesting, in part, that the court decide the preemption and statutory discretion issues. The district court denied that motion. The Credit Union appeals.

## DISCUSSION

The Credit Union argues that the district court erred in dismissing its claim based on the Reserve Bank's illegality defense. This court reviews de novo the district court's grant of the Reserve Bank's motion to dismiss, applying the same standard as the district court. *Doe v. City of Albuquerque*, 667 F.3d 1111, 1118 (10th Cir. 2012). Specifically, we accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the Credit Union. *Id*.

The Reserve Bank's illegality defense is straightforward. It begins with the principle—which the Credit Union doesn't dispute—that a court won't use its equitable power to facilitate illegal conduct. *See Warner Bros. Theatres, Inc. v. Cooper Found.*, 189 F.2d 825, 829 (10th Cir. 1951) (holding that "[a] court of equity should not permit" a party to "take advantage of an admittedly illegal arrangement"); *see also Precision Instrument Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (holding that clean-hands doctrine "presupposes [a court of equity's] refusal . . . to be the 'abetter of iniquity'" (quoting *Bein v. Heath*, 47 U.S. 228, 247 (1848))); *Cartlidge v. Rainey*, 168 F.2d 841, 845 (5th Cir. 1948) ("It is well settled that equity will not lend its aid to the perpetration of criminal acts.").

By its own allegations, the Credit Union would use the court's equitable relief to facilitate illegal activity. If given a master account, the Credit Union "intends to provide banking services to compliant state licensed cannabis and hemp businesses." App. 204. But even if these businesses are "compliant" with Colorado law, their conduct plainly violates the CSA. *See* 21 U.S.C. § 841(a)(1) ("[I]t shall be unlawful for any person knowingly or intentionally . . . to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance.").[4] By providing banking services to these businesses, the Credit Union would—by its own admission—facilitate their illegal activity by giving them bank access that they currently lack. *See* App. 218 ("None of these [MRBs] have

---

[4] Marijuana is a controlled substance. 21 U.S.C. §§ 802(6), 812 (Schedule I)(c)(10).

meaningful and stable access to traditional banking services. . . . The majority of MRBs are forced to operate in cash only, and to suffer the high cost of handling and safeguarding this cash."). And, critically, the Credit Union concedes that it won't be able to serve MRBs without the court's equitable relief. *See* Aplt. Br. 5 ("Without a master account[, the Credit Union] cannot function."). A court-ordered master account would thus serve as the linchpin for the Credit Union's facilitation of illegal conduct.

In response to the Reserve Bank's illegality defense, the Credit Union argues that the MRBs it proposes to serve aren't violating federal law. Specifically, it asserts that "[c]onduct in full compliance with a presumptively valid state medical or recreational marijuana law is legal under state and federal law until the state law is formally invalidated." Aplt. Br. 54. But the Credit Union seemed to abandon this position at oral argument, and for good reason: the CSA, by virtue of the Supremacy Clause, is the law of the land. *See* U.S. CONST. art. VI, cl. 2. Conduct prohibited by federal law is illegal, regardless of what Colorado law may permit. *See Planned Parenthood of Kan. & Mid-Mo. v. Moser*, 747 F.3d 814, 823 (10th Cir. 2014) ("[W]hen state or local law conflicts with federal law, federal law prevails."). For the same reason, I would decline the Credit Union's request to decide whether the CSA preempts Colorado law. Regardless of how we might resolve that issue, the MRBs' conduct would remain federally illegal.[5]

---

[5] I would further decline to consider the Credit Union's argument that federal marijuana law is void for vagueness. The Credit Union raises this argument for the

The Credit Union also argues that it may legally serve MRBs pursuant to certain Executive Branch guidance documents. In 2014, then-Deputy Attorney General James Cole issued a DOJ memorandum outlining that agency's marijuana-banking enforcement priorities. But while the Cole Memorandum suggested that the DOJ may decline to prosecute banks that meet certain criteria, the Memorandum also made clear that its guidance didn't create a legal defense for violations of the CSA or certain money-laundering statutes. *See* App. 488 (explaining that "[t]his memorandum does not alter in any way the [DOJ's] authority to enforce federal law, including federal laws relating to marijuana, regardless of state law" and doesn't "provide[] a legal defense to a violation of federal law, including . . . violation of the CSA, the money laundering and unlicensed money transmitter statutes, or the [Bank Secrecy Act]").

Likewise, the Treasury Department's Financial Crimes Enforcement Network ("FinCEN"), which is responsible for enforcing certain money-laundering statutes, issued its own marijuana-related guidance concurrently with the Cole Memorandum. The FinCEN Guidance purported to "clarif[y] how financial institutions can provide services to marijuana-related businesses consistent with their [anti-money

---

first time on appeal and doesn't argue for plain error review. *See Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1130 (10th Cir. 2011) ("If a newly raised legal theory is entitled to appellate review at all . . . it may form a basis for *reversal* only if the appellant can satisfy the elements of the plain error standard of review."). For the same reason, I would decline to consider the Credit Union's new argument that Congress nullified the CSA by prohibiting the Department of Justice (DOJ) from expending appropriated funds to prevent states from implementing their own medical marijuana laws.

laundering] obligations." App. 490. But this guidance, like the Cole Memorandum, didn't nullify the CSA or federal money-laundering statutes. *See id.* n.3 (noting that certain conduct encompassed by the Cole Memorandum "may merit civil or criminal enforcement of the CSA"). And the Credit Union doesn't explain how Executive Branch enforcement decisions could undermine substantive law. *See Feinberg v. Comm'r of Internal Revenue*, 808 F.3d 813, 816 (10th Cir. 2015) ("[I]n our constitutional order it's Congress that passes the laws, Congress that saw fit to enact 21 U.S.C. § 841, and Congress that in § 841 made the distribution of marijuana a federal crime.").

Perhaps recognizing the gossamer-thin nature of its interpretation of federal law, the Credit Union alternatively argues that it won't serve MRBs unless doing so is legal. Specifically, it argues that its amended complaint plausibly alleges that the Credit Union intends to abide by federal law and that the district court erred in declining to presume these allegations are true. *See* Order, App. 709 (referring to the Credit Union's inconsistent allegations a "sleight of hand"). I agree with the district court: the Credit Union's equivocations don't allay my concern that the equitable relief it seeks will facilitate illegal activity.

In its original complaint, the Credit Union left no doubt about its intent to serve MRBs. Indeed, the dearth of banking services for MRBs is the Credit Union's founding purpose. And the Credit Union amended its complaint to suggest otherwise only after the Reserve Bank raised its illegality defense. Of course, this court looks only to the operative complaint to assess whether the Credit Union's allegations are

9

plausible. But that background sheds light on the amended complaint's series of seemingly inconsistent allegations. On one hand, the Credit Union repeatedly asserts its intent to serve MRBs—an illegal course of conduct. On the other hand, the Credit Union insists that it will follow the law:

- "Consistent with its state credit union charter, <u>and in strict accordance with state and federal laws, regulations and guidance,</u> [the Credit Union] intends to provide banking services to compliant state licensed cannabis and hemp businesses, their employees, [and] industry vendors." App. 204.[6]

- "In March 2014, [the Credit Union's founders] came together to organize a Colorado state-chartered credit union . . . and thereby provide much needed banking services to compliant, licensed cannabis and hemp businesses . . . . <u>The plan to serve the MRB segment of its prospective field of membership would only be executed if authorized by state and federal law.</u>" *Id.* at 219.

- "When [the Credit Union] is granted access to the Federal Reserve payments system it will have the ability to compete . . . for the business of a newly emerging fast-growing industry. <u>[The Credit Union] only intends to serve the potential MRB segment of its membership if authorized by state and federal law.</u>" *Id.* at 237.

- "[Large commercial] banks currently deposit a substantial amount of state legal cannabis money into the Federal Reserve payments system. [The Credit Union] is a putative competitor that also seeks to provide services to MRBs." *Id.*

The Credit Union asserts that its promises to follow the law are plausible. And this court presumes that the amended complaint's well-pleaded factual allegations are true and construes them in the light most favorable to the Credit Union. *Doe*, 667 F.3d at 1118. That principle might benefit the Credit Union if it unequivocally

---

[6] The language added to the original complaint is underlined.

alleged that it won't serve MRBs. But it never does.[7] Instead, the amended complaint's allegations are all conditional: *if* serving MRBs is illegal, *then* the Credit Union won't serve them. We don't owe the presumption of truth to illusory allegations. *Cf. Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1214 (10th Cir. 2011) (explaining that "in ruling on a motion to dismiss, a court should disregard all conclusory statements of law and consider . . . the remaining *specific factual allegations*") (emphasis added). The Credit Union will either serve MRBs or it won't—its allegations can't depend on the answer to a legal question. As one court explained, "There is a significant difference between pleading alternative theories of law based upon given facts and pleading alternative statements of fact to support a given principle of law." *United States v. Gotti,* 771 F. Supp. 535, 540 (E.D.N.Y. 1991).

The Credit Union's promise to follow the law is particularly unworthy of credence because the amended complaint both asserts that the Credit Union plans to serve MRBs "in strict accordance with state and federal laws, regulations and guidance," App. 204, while at the same time carefully avoiding any concessions

---

[7] When pressed at argument in the district court regarding its inconsistent positions, the Credit Union seemed to assert that it won't serve MRBs until federal marijuana law changes. App. 642-43 ("THE COURT: Are you going to serve them or not? . . . [COUNSEL]: Not until we can get additional clarification . . . in regards to this issue."). But when reviewing a motion to dismiss, our analysis is necessarily limited to the pleadings.

regarding what the law actually is, *see, e.g.*, App. 240 ("Whatever the law is, [the Credit Union] will obey.").[8]

After setting aside the Credit Union's non-committal, conclusory allegations, the amended complaint tells a clear story. The Credit Union "intends to provide banking services to compliant state licensed cannabis and hemp businesses, their employees, [and] industry vendors." *Id.* at 204. The district court correctly declined to facilitate this illegality.

In his separate opinion, Judge Bacharach suggests that the Credit Union, by seeking a declaratory judgment, implicitly promised to "abide by the [district court's] ruling" regarding the legality of serving MRBs. Opinion of Bacharach, J., 7. But the Credit Union never asked the district court to declare whether its plan to serve MRBs is legal. Instead, it sought a declaration regarding its supposed entitlement to a master account under 12 U.S.C. § 248a. *See* App. 50-51 ("[The Credit Union] respectfully requests this Court issue a judgment declaring that [the Reserve Bank] must grant [the Credit Union] a master account . . . pursuant to 12 U.S.C. §248a(c)(2)."). The district court took up the illegality issue only when the Reserve Bank raised it as an affirmative defense. And when the Credit Union amended its complaint in response, not even *that* pleading sought a declaration that serving MRBs is legal. In dismissing

---

[8] Judge Bacharach's separate opinion correctly notes that the Credit Union's "stated intent to obey federal law" is a "factual allegation" that the district court should have "accept[ed] as true." Op. of J. Bacharach at 6. But as I've discussed, the Credit Union's own allegations suggest that "obey[ing] federal law" and "servicing marijuana-related businesses" aren't mutually exclusive. *Id.* So the Credit Union's promise to do the former reveals nothing about its intent to refrain from the latter.

the amended complaint, the district court answered a question that the Credit Union never asked.

The Credit Union's final argument is that the Reserve Bank failed to put forth evidence supporting the illegality defense. But as I've discussed, the Credit Union's own allegations establish the defense, and the district court properly granted the Reserve Bank's motion to dismiss on that basis. *See Miller v. Shell Oil Co.*, 345 F.2d 891, 893 (10th Cir. 1965) ("If the defense appears plainly on the face of the complaint itself, the motion may be disposed of under [Rule 12(b)(6)].").

Because I would affirm the district court's dismissal based on the illegality defense, I would not decide whether the Credit Union is entitled to a master account under 12 U.S.C. § 248a or whether federal law preempts the Credit Union's Colorado charter. And because the motion to dismiss disposes of the case, I would not address the Credit Union's argument that the district court erred in denying the Credit Union's motion for summary judgment.

Accordingly, I would affirm the district court's dismissal of the amended complaint with prejudice.

16-1016, *The Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*
**MATHESON**, Circuit Judge.

We should dismiss this case on ripeness grounds.

A. **The Credit Union's New Claim**

The Credit Union was formed primarily to serve MRBs. It requested a master account from the Reserve Bank to do so. The Reserve Bank denied the Credit Union's application for a master account, citing the Credit Union's "focus on serving marijuana-related businesses." Aplt. App. at 485. The Credit Union sued. The Reserve Bank again expressed its misgiving about the Credit Union's plan to serve MRBs in a motion to dismiss the original complaint.

The Credit Union did not re-apply for a master account to alleviate the Reserve Bank's concern about MRBs, but instead just amended its complaint to allege it will serve MRBs only if doing so is legal.

Assuming this allegation is true, as we must, it raises ripeness concerns because this case has become divorced from the factual backdrop that gave rise to the original dispute. As the Reserve Bank points out, the new Credit Union—the Credit Union that excludes MRBs from its membership until serving them becomes legal—is a "fundamentally different[] entity" than the one the Reserve Bank turned down. Aplee. Supp. Br. at 17.

B. **Ripeness**

"The ripeness doctrine aims to prevent courts from entangling themselves in abstract disagreements by avoiding premature adjudication." *Awad v. Ziriax*, 670 F.3d

1111, 1124 (10th Cir. 2012) (quotations omitted). "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quotations omitted). Ripeness has roots "both in the jurisdictional requirement that Article III courts hear only 'cases and controversies' and in prudential considerations limiting our jurisdiction." *Alto Eldorado P'ship v. Cty. of Santa Fe*, 634 F.3d 1170, 1173 (10th Cir. 2011). "[E]ven in a case raising only prudential concerns, the question of ripeness may be considered on a court's own motion." *Nat'l Park Hospitality Ass'n v. Dep't. of Interior*, 538 U.S. 803, 808 (2003).[1]

In assessing prudential ripeness, this court has taken guidance from *Abbott Laboratories v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977), which "instructs courts to assess 'both the fitness of the issues for judicial decision and the hardship to the parties of withholding court

---

[1] The Supreme Court's recognition of the prudential ripeness doctrine goes back many years. *See, e.g.*, *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 57 n.18 (1993) ("Even when a ripeness question in a particular case is prudential, we may raise it on our own motion, and 'cannot be bound by the wishes of the parties.'" (quoting *Reg'l Rail Reorganization Act Cases*, 419 U.S. 102, 138 (1974))). Recently, however, the Supreme Court has identified "some tension" between its prudential justiciability doctrines and "the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Susan B. Anthony List v. Driehaus*, 134 S. Ct. 2334, 2347 (2014) (quotations omitted). The Court chose not to resolve that tension, *see id.* ("[W]e need not resolve the continuing vitality of the prudential ripeness doctrine in this case . . . ."), and we have continued to apply the doctrine, *see United States v. Supreme Court of N.M.*, 839 F.3d 888, 903-04 (10th Cir. 2016) (considering prudential ripeness argument), *petition for cert. filed*, No. 16-1323 (U.S. May 1, 2017).

consideration.'" *United States v. White*, 244 F.3d 1199, 1202 (10th Cir. 2001) (quoting *Abbott Labs.*, 387 U.S. at 149).

### 1. *Fitness*

"First, on fitness, we focus on whether determination of the merits turns upon strictly legal issues or requires facts that may not yet be sufficiently developed." *Awad*, 670 F.3d at 1124 (alterations and quotations omitted).

The Credit Union's amended complaint reveals this case is no longer based on sufficiently developed facts.[2]  In particular, the amended complaint does not and cannot tell us whether the Reserve Bank would grant a master account on the condition that the Credit Union will not serve MRBs unless doing so is legal.  It cannot do so because, as the Credit Union explained to the district court, it has never approached the Reserve Bank about obtaining a master account on the terms now alleged.

The Reserve Bank, in response to our call for supplemental briefing on ripeness, contends the Credit Union's position that it will serve MRBs only if legal is merely an assertion made "in its briefs and during oral argument."  Aplee. Supp. Br. at 2.  But that

---

[2] The ripeness problem here is not the product of a pleading defect.  It stems from a lack of developed facts—the Credit Union has not asked the Reserve Bank for a master account conditioned on its not serving MRBs unless legal, and, having not been asked, the Reserve Bank has not and could not have denied such an application.  Judge Bacharach argues we can decide whether the allegations in the amended complaint are sufficient to state a claim, *see* Op. of Judge Bacharach at 30-32, but even on the face of the amended complaint, the dispute is hypothetical.  And, as explained below, a court's ability to decide a legal question is not the full measure of fitness.

characterization is incorrect because it ignores that the Credit Union made this claim in its amended complaint.[3]

If the Credit Union were to apply again based on its new "only if legal" position, the Reserve Bank may issue a master account, in which case there would be no dispute and a decision here would be only advisory. Or it might reject a master account for some other reason, in which case there may be a dispute, though different from the one that prompted this litigation. We cannot know what the facts would be, making this case premature.[4]

Accepting the amended complaint's factual allegations as true does not obviate the ripeness problem. The sufficiency of the Credit Union's amended complaint presents a legal question, but it does not automatically follow that the case is fit to decide. Indeed,

---

[3] The Credit Union alleged in its amended complaint that "[t]he plan to serve the MRB segment of its prospective field of membership would only be executed if authorized by state and federal law." Aplt. App. at 97; *see also id.* at 97-98, 101, 103, 116 (making similar allegations). And, as my colleagues' opinions also note, this was far from a passing reference. *See* Op. of Judge Moritz at 10 (illustrating changes in amended complaint); Op. of Judge Bacharach at 4-5 (similar).

At a hearing, the district court asked the Credit Union's counsel, "[H]ave you considered talking with counsel for the Federal Reserve Bank of Kansas City and saying to them, hey, guys, if we commit that we won't serve any MRBs, at all, unless and until Congress acts, will you give us a master account, have you considered asking?" Aplt. App. at 646-47. The Credit Union answered, "No, Your Honor." *Id.* at 647. Although this exchange illustrates the ripeness problem in this case, the problem stems not from representations of counsel but rather from the Credit Union's amended complaint itself and its "only if legal" allegations.

[4] Judge Bacharach criticizes this ripeness concern as "stem[ming] from one allegedly missing piece of information," namely, what the Reserve Bank would do with an application from the Credit Union that promised to exclude MRBs unless serving them is legal. Op. of Judge Bacharach at 32. This is a critical piece of information. And it is not allegedly missing; it is missing.

we have found claims, and sometimes entire cases, unripe at the motion-to-dismiss stage. *See, e.g.*, *S. Utah Wilderness Alliance v. Palma*, 707 F.3d 1143, 1157-61 (10th Cir. 2013) (dismissing case); *Salt Lake Tribune Publ'g Co., LLC v. Mgmt. Planning, Inc.*, 454 F.3d 1128, 1140-41 (10th Cir. 2006) (dismissing claim); *see also* 5B C. Wright & A. Miller, Federal Practice and Procedure: Civil § 1350 n.11 and accompanying text (3d ed., Apr. 2017 update) (discussing adjudication of ripeness issues at the pleading stage through a motion to dismiss under Rule 12(b)(1)).[5]  Just because resolution of a legal question is possible, and may even be straightforward, does not mean it is ripe to decide.  As the First Circuit has explained:

> The notion that disputes which turn on purely legal questions are always ripe for judicial review is a myth. . . .  Put bluntly, the question of fitness does not pivot solely on whether a court is capable of resolving a claim intelligently, but also involves an assessment of whether it is appropriate for the court to undertake the task.  Federal courts cannot—and should not—spend their scarce resources in what amounts to shadow boxing. Thus, if a plaintiff's claim, though predominantly legal in character, depends upon future events that may never come to pass, or that may not occur in the form forecasted, then the claim is unripe.

---

[5] Judge Bacharach attempts to distinguish these cases.  *See* Op. of Judge Bacharach at 31-32 n.14.  But in both cases, this court approved dismissals based on ripeness at the pleading stage.  In *Palma*, for the first time on appeal, this court relied on ripeness to dismiss, *see* 707 F.3d at 1157-61, just as I am suggesting here.  In *Salt Lake Tribune*, we affirmed a Rule 12(b)(6) dismissal of a claim based on ripeness.  *See* 454 F.3d at 1133, 1140-41.  Although dismissals based on jurisdiction are technically Rule 12(b)(1) rulings, a federal court's ripeness inquiry does not turn on what rule the defendant cited in the motion to dismiss in district court, or even on whether a motion was filed.  When the alleged facts show an actual dispute has not yet occurred, a federal court, including a circuit court, can and should consider whether the case—including whether the complaint is legally sufficient—is ripe.

*Ernst & Young v. Depositors Econ. Prot. Corp.*, 45 F.3d 530, 537 (1st Cir. 1995) (citations omitted).

A principal difference between Judge Bacharach's opinion and the conclusion reached here is the level of confidence in predicting what would happen if the Credit Union were to ask the Reserve Bank for a master account based on a commitment to serve MRBs only if legal. He thinks the Reserve Bank would almost certainly deny the application and thus concludes there is no ripeness issue. *See* Op. of Judge Bacharach at 32-35. I am much less certain what would happen.

The Credit Union's plan to serve MRBs was a key reason why the Reserve Bank denied the master account application. With that justification gone, we do not know what would happen under the Credit Union's revised stance. The Reserve Bank's letter to the Credit Union explained it was denying a master account based on the Credit Union's planned MRB service and "[o]ther factors" "[t]aken together." Aplt. App. at 485.[6] The other factors included: (1) "the nature of [the Credit Union's] proposed business model"; (2) lack of capital; (3) failure to obtain insurance; and (4) its status as a "de novo depository institution." *Id.*

---

[6] This court may rely on the Reserve Bank's letter because the Credit Union's amended complaint refers to it. *See* Aplt. App. at 115 (discussing denial letter); *see also Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002) (explaining that a court considering a motion to dismiss "may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity"); *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384-85 (10th Cir. 1997).

These other factors do not mitigate the ripeness concern that the amended complaint has spawned.  First, the Reserve Bank based its master account denial on these "[o]ther factors" "[t]aken together" with the MRB concern, suggesting its reasons collectively formed the basis for the denial.  *Id.*  In other words, the denial letter did not say whether any reason, standing alone, would have been enough to deny the master account.  Second, the Reserve Bank identified some of these other concerns as intertwined with the Credit Union's planned service of MRBs.  For example, the denial letter tied the "de novo" justification to the MRBs.  *See id.* (explaining the de novo issue was "of particular concern given [the Credit Union's] focus on serving marijuana-related businesses").[7]  Third, although the Reserve Bank's lawyer told the district court he

---

[7] In its supplemental brief, the Reserve Bank again ties several of its reasons for denying the master account to its concerns about the Credit Union's serving MRBs.  It refers generally to the "inherent risks associated with providing [the Credit Union] a master account" and to "the nature of [the Credit Union's] proposed business model, which focuses on a newly licensed industry with relatively immature businesses operating in an environment of evolving laws and regulations."  Aplee. Supp. Br. at 5.  More specifically, it lists:

- The Credit Union's "ability to . . . comply with applicable laws"—an issue "of particular concern given [its] focus on serving marijuana-related businesses"; and

- The National Credit Union Administration's concern that the Credit Union "had not demonstrated its ability to conduct appropriate enhanced monitoring requirements and manage its risk appropriately with respect to its customers with marijuana-related businesses."

*Id.*  It makes sense that many of the Reserve Bank's reasons tie back to the MRB concern.  For instance, by not serving MRBs, the Credit Union may find it easier to obtain insurance, and, with insurance, may find it easier to attract capital.  Thus, the new plan described in the Credit Union's amended complaint may cause many of its problems

Continued . . .

"seriously doubt[ed]" a promise from the Credit Union not to serve MRBs would make a difference, *id.* at 656, this was an inconclusive prediction.  As discussed below, the Reserve Bank identifies many unanswered questions in its supplemental brief about an MRB-free Credit Union, suggesting the possibility of a different outcome.

Despite its new position that it will serve MRBs only if legal, the Credit Union argues that submitting another master account application would be futile.  This ignores why the Reserve Bank denied the first application.  The Credit Union's business plan was not part of its master account application, but the Credit Union's planned service of MRBs was part of the reasoning for the Reserve Bank's denial.  The Credit Union has not sought a master account on the new condition that it will not serve MRBs unless legal, and its revised litigation position does not substitute for a new application to the Reserve Bank.  The Credit Union has filed two complaints contemplating two very different financial entities, but it has submitted only one master account application.  As the Reserve Bank points out, an MRB-free "application would raise numerous questions that have yet to be asked, much less answered."  Aplee. Supp. Br. at 17.[8]  Given the change in

---

to fall away.  This may not be the case, but we do not now know what remaining hurdles, if any, might stand between the Credit Union and a master account.

[8] As explained in the Reserve Bank's supplemental brief, these questions include:

- Would [the Credit Union] be able to obtain deposit insurance with a non-marijuana business plan?

- Would [the Credit Union's] revised business plan need to be approved by the State of Colorado and, if so, would it be approved?

Continued . . .

circumstances, submitting another application would hardly be an empty gesture. And even if the result is another denial, it would at least make the factual scenario created by the amended complaint real rather than hypothetical.

In short, we do not know what would happen if the Credit Union were to seek a master account based on the new plan alleged in its amended complaint. As the Reserve Bank discerns, the Credit Union is attempting "to retroactively alter the nature of the dispute." *Id.* at 2. The issues the Credit Union raises are not yet fit for judicial decision.

2. *Hardship*

- As a *de novo* institution with no historical track record of operations, could [the Credit Union] demonstrate that it can operate safely and soundly and that it has appropriate compliance procedures, particularly for Bank Secrecy Act and Anti-Money Laundering responsibilities?

- How would [the Credit Union] satisfy the [Reserve Bank's] concern that it will lack capital at inception?

- Could [the Credit Union] establish a correspondent relationship with a bank with a pre-existing master account?

- Would [the Credit Union's] charter or field of membership be subject to review or revocation if it were prohibited from executing an important part of the business plan, and the economic assumptions on which the charter was issued were materially different?

- Given the focus of [the Credit Union's] prior business plan on serving MRBs, would [the Reserve Bank] have to examine [the Credit Union's] operations to ensure that it limited its business as stated in its new business plan?

*Id.* at 17-18 (bullets added).

In the second part of our ripeness analysis, we assess the potential "hardship from withholding judicial review" by asking "whether the challenged action creates a direct and immediate dilemma for the parties." *Awad*, 670 F.3d at 1125 (quotations omitted). The Reserve Bank faces no hardship. As for the Credit Union, the challenged action is the Reserve Bank's denial of a master account, which the Credit Union argues should have issued within days of its initial request. Without a master account, the Credit Union contends, it cannot conduct its affairs. The Credit Union's supplemental briefing also alludes to an unspecified "irremediable adverse consequence that would flow from requiring a later challenge," Aplt. Supp. Br. at 13, but it provides no particulars on how a dismissal on ripeness grounds would alter the status quo. *See Los Alamos Study Grp. v. U.S. Dep't of Energy*, 692 F.3d 1057, 1064 (10th Cir. 2012) (explaining the plaintiff bears the burden of showing ripeness).

The Credit Union's continued inability to conduct legal business is a hardship, but the scope of the hardship is far from clear. If a dismissal based on ripeness can be said to put the Credit Union in a direct or immediate dilemma, it can do what it never bothered to try—including while this case was pending—and ask the Reserve Bank for a master account now that it does not plan to serve MRBs so long as doing so is illegal. Indeed, this course, rather than continuing with this litigation, may be the Credit Union's most efficient pathway to obtaining a master account.

Judge Bacharach notes that "months may pass" before the Reserve Bank acts on any reapplication. Op. of Judge Bacharach at 38. But just as we do not know whether the Reserve Bank would grant a master account to an MRB-free Credit Union, we do not

know how long the Reserve Bank might need to process such a request.  He points out the Reserve Bank took approximately nine months to act on the Credit Union's first application, *see id.*, but that history may not be a good guide to the future.  The original delay was more than likely based on concern over the Credit Union's plan to serve MRBs.  Without that complication, and with the benefit of the detailed knowledge it has garnered about the Credit Union, the Reserve Bank may find disposition of a new application relatively straightforward.  The Credit Union asserts that processing normally takes just five to seven business days.

The ripeness problem here traces back to the Credit Union's decision to amend its complaint.  Under the circumstances discussed here, the Credit Union's potential hardship does not overcome the fitness concerns outlined above.  *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 814-15 (Stevens, J., concurring in the judgment) (explaining fitness "is the more important" inquiry and that hardship is "less important").[9]

---

[9] This court's disposition effectively lessens any hardship for the Credit Union. The Credit Union entered this litigation apparently unsure about the legality of serving MRBs (as was still evident from the uncertainty built into its amended complaint's "only if legal" allegation).  Judge Bacharach, relying on his opinion and the opinion of Judge Moritz, stitches together a panel holding "that servicing marijuana-related businesses remains illegal under federal law."  Op. of Judge Bacharach at 37.  With the benefit of that holding, the Credit Union "will know that servicing [MRBs] is illegal" and can now choose whether to pursue a master account for an MRB-free field of membership.  *Id.* Maybe it will, and maybe, if it does, the Reserve Bank will issue a master account.

C.  **Conclusion**

As the Reserve Bank observes, the Credit Union "is apparently seeking court review of a decision that [the Reserve Bank] has never made and that the district court never considered."  Aplee. Supp. Br. at 16.  I would dismiss this appeal as premature and remand to the district court to vacate the judgment and dismiss without prejudice.

*The Fourth Corner Credit Union v. Federal Reserve Bank of Kansas City*,
No. 16-1016.

**BACHARACH**, J.

This case involves the denial of a request for a master account. A
master account is required to purchase services that are indispensable for
all financial institutions.[1] Without a master account, a financial institution
must obtain these services through another institution serving as a
"middleman." To avoid the middleman, a financial institution must obtain
a master account from one of the regional Federal Reserve Banks.

The plaintiff, The Fourth Corner Credit Union, is a credit union that
requested a master account from one of the regional Federal Reserve Banks

---

[1]    The Board of Governors of the Federal Reserve System explains:

The master account is both a record of financial transactions
that reflects the financial rights and obligations of an account
holder and the Reserve Bank with respect to each other, and the
place where opening and closing balances are determined. For
each institution, all credits and debits resulting from the use of
Federal Reserve services at any Federal Reserve office are
booked to this single master account at one Reserve Bank.

Bd. of Governors of the Fed. Reserve Sys., *Reserve Maintenance Manual* 5
(Nov. 2016), available at https://www.federalreserve.gov/monetarypolicy/
files/reserve-maintenance-manual.pdf.

This manual does not appear in the appellate record. But we may take
judicial notice of the manual and other materials on the Board of
Governors' website. *See New Mexico ex rel. Richardson v. Bureau of Land
Mgmt.*, 565 F.3d 683, 702 n.22 (10th Cir. 2009) (taking judicial notice of
materials on the websites of two federal agencies); *see also Winzler v.
Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1213 (10th Cir. 2012)
("The contents of an administrative agency's publicly available files . . .
traditionally qualify for judicial notice . . . .").

(the Federal Reserve Bank of Kansas City). This request would ordinarily be considered routine for the Federal Reserve Bank of Kansas City. But the Federal Reserve Bank of Kansas City learned from a third party that Fourth Corner wanted to service marijuana-related businesses in a state that had legalized these businesses.[2] The Federal Reserve Bank of Kansas City refused to grant the master account, prompting Fourth Corner to sue for a declaratory judgment and an injunction.

The Federal Reserve Bank of Kansas City moved to dismiss, arguing in part that Fourth Corner would use the master account to violate federal drug laws. The district court agreed and dismissed the amended complaint.

In my view, this ruling was erroneous for two reasons. First, the district court should have presumed that Fourth Corner would follow the law as determined by the court. Second, in the amended complaint, Fourth

---

[2]     In the amended complaint, Fourth Corner identified the documents submitted to the Federal Reserve Bank of Kansas City for a master account. These documents did not include the business plan or any other document describing the type of business to be conducted. Apparently, however, the Bank learned of the business plan from some other source. In a letter, the Bank told Fourth Corner that a master account would be denied for eight reasons, including Fourth Corner's desire to service marijuana-related businesses. *See* Part VI(C), below. Based on the allegations in the amended complaint, this letter constituted the Bank's first communication to Fourth Corner about an unwillingness to issue a master account because of Fourth Corner's desire to service marijuana-related businesses. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997) (stating that in considering a motion to dismiss for failure to state a valid claim, the court can consider indisputably authentic copies of documents referenced in the complaint and central to the plaintiff's claim).

Corner promised to obey the law. By seeking a declaratory judgment, Fourth Corner acknowledged that the court was the sole arbiter of the law. Thus, the amended complaint indicates that Fourth Corner would obey a ruling that servicing marijuana-related businesses is illegal.[3]

## I.    Standard of Review

In this appeal, we engage in de novo review. *Shimomura v. Carlson*, 811 F.3d 349, 358 (10th Cir. 2015). This review requires us to determine whether the amended complaint states a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In gauging the claim's plausibility, we credit all of the amended complaint's well-pleaded factual allegations and view them in the light most favorable to Fourth Corner. *See Colby v. Herrick*, 849 F.3d 1273, 1279 (10th Cir. 2017).

## II.   The Amended Complaint and the District Court's Dismissal

In the amended complaint, Fourth Corner stated that it would service marijuana-related businesses only if authorized by federal law. Fourth Corner argued that servicing these businesses had been legalized by recent guidance from federal agencies. But in the amended complaint, Fourth Corner promised that "[w]hatever the law is, [Fourth Corner] will obey."

---

[3]    Fourth Corner also argues that its motion for summary judgment should have been granted. Like my colleagues, I do not discuss the summary-judgment ruling, for it became academic upon dismissal of the amended complaint.

Appellant's App'x at 240. Elsewhere in the amended complaint, Fourth

Corner committed to obey the law, stating:

> [Fourth Corner's charter] states [that Fourth Corner] is
> "authorized to conduct business pursuant to all of the powers
> conferred upon it by law, until this charter is suspended,
> revoked or otherwise surrendered in the manner directed by
> statute." [Fourth Corner] takes this grant of authority to mean
> it must comply with both state and federal law, and it intends
> to do so.

*Id.* at 224-25. Four other allegations in the amended complaint reiterated

Fourth Corner's intent to obey the law:

> 1.    The plan to serve the [marijuana-related business]
>       segment of [Fourth Corner's] prospective field of
>       membership would only be executed if authorized by state
>       and federal law.

*Id.* at 219.

> 2.    The proposed credit union's business plan was
>       straightforward – (i) build a Colorado state-chartered
>       credit union around a culture of compliance; . . . (iii) if
>       service of [marijuana-related businesses] is authorized by
>       state and federal law, charge credit union members that
>       required enhanced monitoring service fees commensurate
>       with the cost of the enhanced due diligence required by
>       [federal guidance from the United States Department of
>       the Treasury's Financial Crimes Enforcement Network
>       and a memorandum from the Department of
>       Justice]; . . . and (vi) become a regulatory partner with
>       state and federal government to perform the "gatekeeper"
>       function as envisioned by [the Financial Crimes
>       Enforcement Network's guidance] and the Bank Secrecy
>       Act . . . .

*Id.* at 219-20.

3.   [Fourth Corner] only intends to serve the [marijuana-related business] segment of its prospective field of membership if authorized by law.

*Id*. at 222.

4.   [Fourth Corner] only intends to serve the potential [marijuana-related business] segment of its membership if authorized by state and federal law.

*Id*. at 237.

Fourth Corner also explained that if servicing marijuana-related businesses is illegal, Fourth Corner would confine its business to servicing members of social groups supporting the legalization of marijuana. This part of Fourth Corner's business plan was legal, and no one has suggested otherwise. But servicing marijuana-related businesses is different, and the district court properly concluded that this part of Fourth Corner's plan would have violated federal drug laws.

Upon drawing this conclusion, the district court interpreted Fourth Corner's promise to obey the law. In the district court's view, Fourth Corner was promising to follow its own understanding of the law, not to obey the district court's pronouncement of the law. Interpreted this way, the promise gave the district court little confidence that Fourth Corner would obey federal drug laws, for Fourth Corner had argued that servicing marijuana-related businesses was legal. Suspicious that Fourth Corner would follow its own understanding of the law rather than the court's, the district court granted the motion to dismiss.

5

## III.  Error in Dismissing the Amended Complaint

This ruling was erroneous in two ways.

First, the district court improperly discounted Fourth Corner's stated intent to obey federal law. This allegation of intent constituted a factual allegation. *See, e.g.*, *United States v. Hayes*, 477 F.2d 868, 873 (10th Cir. 1973) (recognizing that "actual intent or state of mind" involves a factual inquiry). And like any other factual allegation, this one should have been interpreted favorably to Fourth Corner (as the non-movant). *See* Part I, above.

At a bench trial, the district court could freely decide whether Fourth Corner actually intended to obey federal law. *See Mathis v. Huff & Puff Trucking, Inc.*, 787 F.3d 1297, 1305 (10th Cir. 2015) (indicating that in a bench trial, the district court "has the exclusive function of appraising credibility" (internal quotation marks omitted)). But here the district court evaluated the validity of Fourth Corner's assertion at the motion-to-dismiss stage. At this stage, the district court must accept as true all of Fourth Corner's well-pleaded factual allegations and view them in the light most favorable to Fourth Corner. *See* Part I, above. The district court was not free to scuttle these requirements.

Second, the district court should have presumed that Fourth Corner would obey the ruling that servicing marijuana-related businesses is illegal. *See, e.g.*, *Royal Coll. Shop, Inc. v. N. Ins. Co. of N.Y.*, 895 F.2d

670, 682-83 (10th Cir. 1990) (discussing the presumption that a person obeys the law); *NLRB v. Shawnee Indus., Inc.*, 333 F.2d 221, 225 (10th Cir. 1964) ("It is presumed that a person obeys the law and discharges the obligations imposed on him by law."). This presumption is especially fitting here, where Fourth Corner acknowledged the court's role as arbiter of the law by the very act of asking for a declaratory judgment.[4] *See Specht v. Jensen*, 853 F.2d 805, 807 (10th Cir. 1988) ("[I]t is axiomatic that the judge is the sole arbiter of the law and its applicability.").[5] But even without this acknowledgment, the district court should have presumed that Fourth Corner would abide by the ruling.

Nothing in the amended complaint overcame this presumption. Indeed, as explained above, the amended complaint indicated that Fourth Corner intended to obey the law. And by acknowledging the court's role as

---

[4]    The proposed declaratory judgment involved the right to a master account, not the legality of servicing marijuana-related businesses. But by seeking a declaratory judgment, Fourth Corner acknowledged the court's role as arbiter of the law.

[5]    In my view, Fourth Corner unambiguously acknowledged the court's role as the arbiter of what was legal. But any lingering doubt would have been dispelled at the hearing on the motion to dismiss. There Fourth Corner expressly embraced the court's status as arbiter of the law: "Your Honor, . . . with every word you speak, you are the law. . . . I'm listening to every word you say, and I'm looking to the Court for direction, to the extent that the Court can provide it." Appellant's App'x at 643-44; *accord id.* at 691-92 (indicating that Fourth Corner would obey the court's conclusion, articulated during the hearing, that federal guidance had not authorized financial institutions to service marijuana-related businesses).

arbiter of the law, Fourth Corner's promise to obey the law meant that Fourth Corner would obey the court's eventual pronouncement of the law.

Nonetheless, the district court interpreted Fourth Corner's promise to obey the law in a way that conflicted with the amended complaint as a whole and Fourth Corner's acknowledgment of the court as arbiter of the law. As stated above, Fourth Corner effectively asserted that it intended to obey the district court. Given this assertion, it makes little sense to interpret Fourth Corner's promise merely as a pledge to obey what Fourth Corner already thought the law was. At this stage of the proceedings, the only reasonable interpretation is that Fourth Corner promised to acquiesce in the district court's pronouncement of the law.[6]

The district court's contrary interpretation was erroneous because it rested on misapplication of the standard on a motion to dismiss and abandonment of the presumption that Fourth Corner would follow the law.

---

[6]     This interpretation is supported by Fourth Corner's discussion at the hearing on the motion to dismiss. The district court asked whether Fourth Corner would stipulate to "an order that enjoins [Fourth Corner] from serving [marijuana-related businesses] unless and until the Controlled Substances Act is amended to permit marijuana possession." *Id.* at 629-30. Fourth Corner answered that it would stipulate to such an order. *Id.* On appeal, Fourth Corner made essentially the same commitment at oral argument.

## IV. The Federal Reserve Bank of Kansas City's Alternative Arguments for Affirmance

The Federal Reserve Bank of Kansas City contends that we may affirm the dismissal on two alternative grounds:

1.    Fourth Corner lacks a statutory right to a master account.

2.    Fourth Corner's charter is preempted because it poses an obstacle to Congress's goals under the Controlled Substances Act.

I would reject both arguments.

### A.    Fourth Corner's Statutory Right to a Master Account

Fourth Corner argues that it is entitled to a master account under 12 U.S.C. § 248a(c)(2). The Federal Reserve Bank of Kansas City counters that federal law does not entitle Fourth Corner to a master account. Though Fourth Corner relies on § 248a(c)(2), the Federal Reserve Bank of Kansas City contends that it obtained discretion under 12 U.S.C. § 342. According to Federal Reserve Bank of Kansas City, § 342 creates discretion on whether to issue a master account.

The district court properly rejected this argument, for § 248a(c)(2) unambiguously entitles Fourth Corner to a master account. This interpretation of § 248a(c)(2) is supported by (1) repeated interpretations by the Board of Governors and regional Federal Reserve Banks, (2) the legislative history, and (3) the longstanding interpretation of this statute by other courts and academics.

9

### 1.      The Meaning of § 248a(c)(2)

Fourth Corner argues that the right to a master account is nondiscretionary under 12 U.S.C. § 248a(c)(2). This section was enacted as part of the 1980 Deregulation and Monetary Control Act and states:

> The schedule of fees prescribed pursuant to this section shall be based on the following principles:
> . . .
>
> (2) All Federal Reserve bank services covered by the fee schedule shall be available to nonmember depository institutions and such services shall be priced at the same fee schedule applicable to member banks . . . .

12 U.S.C. § 248a(c)(2) (2012).[7] In my view, this language unambiguously entitles Fourth Corner to a master account.

### a.      The Statute's Unambiguous Language

Interpretation of § 248a(c)(2) begins with its language. *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438 (1999); *United States v. Handley*, 678 F.3d 1185, 1189 (10th Cir. 2012). The statutory language does two things: It ensures universal access to certain bank services and provides uniform pricing for them.

The statute uses the term "shall," which indicates a congressional command. *See Lopez v. Davis*, 531 U.S. 230, 241 (2001) ("Congress used 'shall' to impose discretionless obligations . . . ."). Thus, the statute

---

[7]      The Federal Reserve System classifies financial institutions as either member banks or nonmember depository institutions. Member banks own shares of a Federal Reserve Bank and elect most members of the board of directors. Nonmember depository institutions do not.

commands Federal Reserve Banks to make all services covered by "the fee schedule" available to "nonmember depository institutions." In this way, the statute establishes open access to Federal Reserve services for nonmember depository institutions. Fourth Corner is a nonmember depository institution; thus, Fourth Corner is entitled to obtain the services covered in the fee schedule.

The Federal Reserve Bank of Kansas City and the Federal Reserve System's Board of Governors, as amicus curiae, argue that the issuance of master accounts is omitted from the fee schedule's list of services. Fourth Corner disagrees, invoking a catchall provision that requires Federal Reserve Banks to provide nonmember depository institutions with access to "any new services" offered through the Federal Reserve System. 12 U.S.C. § 248a(b)(8).

For the sake of argument, I assume that the issuance of master accounts does not constitute a new service covered by this catchall provision. Even with this assumption, § 248a(c)(2) would require the issuance of master accounts, for all services offered by the Federal Reserve System are conditioned on the issuance of master accounts. Op. of Judge Moritz at 3-4*; see also* Fed. Res. Banks, Operating Circular No. 7, *Book-Entry Securities Account Maintenance and Transfer Services* ¶¶ 3.19, 3.21, & 5.2 (eff. June 30, 2016) (stating that each entity with a Federal Reserve securities account must maintain a master account to send or receive

11

transfers with assignment of credit to the sender and debit to the receiver). Without a master account, none of the fee schedule's services would be available. Thus, a nonmember depository institution like Fourth Corner can operate only by obtaining its own master account or using a middleman that has a master account.

Nonetheless, the Bank contends that it can deny a master account because the issuance of master accounts is not specifically listed in the services covered by § 248a(c)(2). This contention flies in the face of Congress's unambiguous command to make services in the fee schedule available to nonmember depository institutions. *See United States v. Walker*, 947 F.2d 1439, 1443-44 (10th Cir. 1991) (rejecting a construction of a statute that "would allow a bank officer to circumvent [congressional] intent"). I would reject this effort to subvert congressional intent.

The Federal Reserve Bank of Kansas City and the Board of Governors protest that Fourth Corner's interpretation reads a new word into § 248a(c)(2): "all." The statute does not say that Federal Reserve services "shall be available to *all* nonmember depository institutions." Instead, the statute requires "all Federal Reserve bank services" to be made available to "nonmember depository institutions." 12 U.S.C. § 248a(c)(2). Thus, the Federal Reserve Bank of Kansas City and the Board of Governors reason, regional Federal Reserve Banks need not make their services available to *all* nonmember depository institutions.

12

I disagree. In my view, the statute would have the same meaning regardless of whether the word "all" preceded the phrase "nonmember depository institutions." In either case, regional Federal Reserve Banks would be obligated to make the designated services available to all nonmember depository institutions.

If the word "all" had been included, it would have served as an indefinite adjective, modifying the phrase "nonmember depository institutions." *See* Bryan A. Garner, *The Chicago Guide to Grammar, Usage, and Punctuation* 60 (2016) (defining indefinite adjectives); *see also United States v. Legg*, 157 F.2d 990, 992 (4th Cir. 1946) (recognizing that "all" can constitute an indefinite adjective); *Clapp v. Heiner*, 51 F.2d 224, 226 (3d Cir. 1931) (same); *Lewis v. Moore*, 80 Mass. 184, 185 (1859) (same). Had "all" been included, the phrase "shall be available to all nonmember depository institutions" could have meant "shall be available to each and every nonmember depository institution." *See Webster's Third New International Dictionary* 54 (Philip Babcock Gove ed., 1993) (defining one adjectival form of "all").

But even without the word "all," the phrase "shall be available to nonmember depository institutions" means "shall be available to each and every nonmember depository institution." Omitting "all" resulted in the

absence of a restrictive modifier[8] for the phrase "nonmember depository institutions." Without a restrictive modifier, the phrase "nonmember depository institutions" is an inclusive term that includes all nonmember depository institutions. *See W. Minn. Mun. Power Agency v. Fed. Energy Regulatory Comm'n*, 806 F.3d 588, 592 (D.C. Cir. 2015) (concluding that the terms "states" and "municipalities" include all states and municipalities because of the absence of language qualifying or restricting the terms "states" and "municipalities"); *Gares v. Willingboro Twp.*, 90 F.3d 720, 726 (3d Cir. 1996) (interpreting the plain meaning of the noun phrase "prevailing plaintiffs" to include all prevailing plaintiffs); *Leininger v. Pioneer Nat'l Latex*, 875 N.E.2d 36, 43 (Ohio 2007) (interpreting the term "Damages," without a restrictive modifier, as "an inclusive term embracing the panoply of legally recognized pecuniary relief" (internal quotation marks omitted)).

In similar circumstances, drafters of statutes are often cautioned against unnecessarily inserting the adjective "all" before a plural noun (like "nonmember depository institutions"). *See, e.g.*, 101 Pa. Code § 15.142(c) (stating that "it is almost never necessary to use" "indefinite

---

[8]     A restrictive modifier is a word in a noun phrase that restricts the meaning of the noun. *See* William Frawley, *Linguistic Semantics* 79 (2013).

14

adjectives" such as "all" "[i]f the subject of the sentence is plural"). For

example, one drafting treatise states:

> a.   Use adjectives such as "each," "every," "any," *all*,"
>      "no," and "some" (technically known as "pronominal
>      indefinite adjectives") only when necessary.

> b.   If the subject of the sentence is plural, it is almost never
>      necessary to use this kind of adjective (e.g., Majors of the
>      Regular Army shall . . . . ; Majors of the Regular Army
>      may not . . . .).

William P. Statsky, *Legislative Analysis and Drafting* 184 (2d ed. 1984)

(emphasis added); *see also* Reed Dickerson, *Legislative Drafting* 81 (1954)

(same quotation with a different example of plural nouns). Similarly, a

scholar advises:

> "All" is frequently used unnecessarily to give a spurious kind
> of   emphasis.   Constructions   may   involve   tireless
> circumlocution. For example—

> > All those persons who are elected members of the Board
> > shall hold office for three years.

> It is quite adequate to say—

> > Elected members of the Board shall hold office for three
> > years.

G.C. Thornton, *Legislative Drafting* 77 (1970); *see also* Lawrence E.

Filson & Sandra L. Strokoff, *The Legislative Drafter's Desk Reference*

§ 22.10, at 297-98 (2d ed. 2008) ("The terms 'any,' 'each,' and 'every'

should ideally be reserved for expressions that require unusual emphasis,

or for those cases where the use of 'a' or 'an' might permit the unintended

interpretation that the obligation is to be discharged (or the privilege exhausted) by applying it to a single member of the class instead of to all of them.").

As these drafting treatises suggest, it was unnecessary to put "all" before a plural noun like "nonmember depository institutions." The meaning was the same with or without the adjective "all." Either way, § 248a(c)(2) unambiguously entitled all nonmember depository institutions to a master account.

**b.    Past Interpretations by the Board of Governors**

As noted above, the Board of Governors argues as amicus curiae that § 248a(c)(2) does not entitle all nonmember depository institutions to Federal Reserve services. This position is new and unique for the Board.

Before this litigation, the Board of Governors had uniformly interpreted the 1980 Deregulation and Monetary Control Act to extend Federal Reserve services to all "depository institutions." *See, e.g.*, *Policies: The Federal Reserve in the Payments System*, Bd. of Governors of the Fed. Reserve Sys. (1990), available at http://www.federalreserve.gov/ paymentsystems/pfs_frpaysys.htm ("Federal Reserve payment services are available to all depository institutions . . . ."); *Policies: Standards Related to Priced-Service Activities of the Federal Reserve Banks*, Bd. of Governors of the Fed. Reserve Sys. (1984) ("The Monetary Control Act of 1980 . . . has expanded the Federal Reserve's role by requiring the Federal

16

Reserve to provide its services to all depository institutions on an equitable basis . . . ."), available at http://www.federalreserve.gov/paymentsystems/pfs_standards.htm; *Policies: Principles for the Pricing of the Federal Reserve Bank Services*, Bd. of Governors of the Fed. Reserve Sys. (1980) ("Services covered by the fee schedule are available to all depository institutions."), available at http://www.federalreserve.gov/paymentsystems/pfs_principles.htm.

Even now, the Board of Governors continues to announce on its website that the 1980 Deregulation and Monetary Control Act gives "*all* depository institutions access to the Federal Reserve's payment services." *Federal Reserve's Key Policies for the Provision of Financial Services: About*, Bd. of Governors of the Fed. Reserve Sys., https://www. federalreserve.gov/paymentsystems/pfs_about.htm (last updated Oct. 28, 2016) (emphasis added). Thus, the amicus brief in this case appears to be the only time that the Board of Governors has doubted the right of every nonmember depository institution to access the Federal Reserve's services—even though the adjectival "all" was omitted before the statutory phrase "nonmember depository institutions."

Ignoring its past pronouncements and current view expressed on its own website, the Board of Governors argues that we should defer to its litigation position here. I would not do so for two reasons.

17

First, § 248a(c)(2) is not ambiguous. The plain text of § 248a(c)(2) indicates that nonmember depository institutions are entitled to purchase services from Federal Reserve Banks. To purchase these services, a master account is required. Thus, nonmember depository institutions, such as Fourth Corner, are entitled to master accounts. *See* Part IV(A)(1)(a), above. The Board of Governors' current litigation position cannot trump the plain meaning of the statute. *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-43 (1984) ("If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.").

Second, this litigation position conflicts with the Board of Governors' longstanding interpretation of the statute. Indeed, even now the Board of Governors continues to state on its webpage that federal law gives all depository institutions access to the Federal Reserve's payment services. As a result, the Board's current interpretation is "'entitled to considerably less deference' than a consistently held agency view." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 515 (1994) (quoting *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 446 n.30 (1987)); *see also* William N. Eskridge, Jr., Philip P. Frickey & Elizabeth Garrett, *Legislation and Statutory Interpretation*, 334 (2d ed. 2006) ("Agency litigating positions are generally not entitled to *Chevron* deference, in part because the agency is not exercising delegated authority when it takes

litigating positions and in part because of fairness concerns that the agency as advocate will not develop interpretations solely through the use of neutral expertise.").

### c. Interpretations by Officials with the Regional Federal Reserve Banks

The Board of Governors' past interpretations of the statute are widely shared by officials of the regional Federal Reserve Banks, who join the chorus of officials recognizing that the 1980 Deregulation and Monetary Control Act extends Federal Reserve services to all nonmember depository institutions. *See, e.g.*, J.L. Jackson & Willis J. Winn, *Foreword to Federal Reserve Bank of Cleveland 1980 Annual Report* 2, 2 (1981) (stating that in light of the 1980 Deregulation and Monetary Control Act, "[o]ur services will now be available to all depository institutions"), available at https://www.clevelandfed.org/~/media/content/newsroom%20 and%20events/publications/annual%20reports/ar%201980%20the%20 monetary%20control%20act%20mandate%20for%20change%20pdf.pdf?la= en; Elijah Brewer III, *The Depository Institutions Deregulation and Monetary Control Act of 1980*, Econ. Perspectives, Sept.-Oct. 1980, at 3, 4 (stating that the 1980 Deregulation and Monetary Control Act requires the Federal Reserve to "grant all depository institutions access to [Federal Reserve] services"), available at https://www.chicagofed.org/digital_ assets/publications/economic_perspectives/1980/ep_sep_oct1980_part1_

brewer.pdf; Lynn Elaine Browne, *The Evolution of Monetary Policy and the Federal Reserve System Over the Past Thirty Years: An Overview*, New Eng. Econ. Rev., Jan.-Feb. 2001, at 3, 8 (stating that the 1980 Deregulation and Monetary Control Act required the Federal Reserve to make Federal Reserve services "available to all depository institutions"), available at https://www. bostonfed.org/-/media/Documents/neer/neer101a.pdf; Anatoli Kuprianov, *The Monetary Control Act and the Role of the Federal Reserve in the Interbank Clearing Market*, Econ. Rev., July-Aug. 1985, at 23 (stating that the 1980 Deregulation and Monetary Control Act required Federal Reserve services to be "made available to all depository institutions on equal terms"), available at https://www.richmondfed.org/-/media/richmondfedorg/publications/research/economic_review/1985/pdf/er710403.pdf; Gary C. Zimmerman, *The Pricing of Federal Reserve Services Under the MCA*, Econ. Rev., Winter 1981, at 22 (1981) (stating that the 1980 Deregulation and Monetary Control Act "provides for access by all depository institutions to major [Federal Reserve] services"), available at http://www.frbsf.org/education/files/81-1_22-40.pdf.

### d.    Legislative History

If § 248a(c)(2) were ambiguous, we could rely not only on this consensus of interpretation but also on Congress's own expression of its intent. Doing so, we find that Congress hoped to do exactly what it did do: establish open access to Federal Reserve services.

In the years leading up to enactment of the 1980 Deregulation and Monetary Control Act, Congress sought to establish open access to Federal Reserve services. *See, e.g.*, H.R. Rep. No. 95-1590, at 20 (1978) ("The [House Committee on Banking Finance and Urban Affairs] believes that the wide access to Federal Reserve services for nonmember banks authorized by this bill will insure [sic] that a basic level of services is available to all banks throughout this country on a nondiscriminatory basis."). This objective was ultimately implemented through 12 U.S.C. § 248a(c)(2). *See, e.g.*, 126 Cong. Rec. 6250 (1980) (Conf. Rep.) ("House amendment includes a provision for the Federal Reserve to . . . open access to [Federal Reserve] services to all depository institutions on the same terms and conditions as member banks."). Thus, the legislative history supports the widespread agreement that the 1980 Deregulation and Monetary Control Act entitles every nonmember depository institution to Federal Reserve services.

### e.    Interpretation of § 248a(c)(2) by Other Circuits and Academics

This interpretation of § 248a(c)(2) is also supported by the case law and academic commentary.

Two circuits have interpreted § 248a(c)(2) to establish open access to Federal Reserve services. *See Greater Buffalo Press, Inc. v. Fed. Reserve Bank of N.Y.*, 866 F.2d 38, 40 (2d Cir. 1989) (stating that the 1980

21

Deregulation and Monetary Control Act made "check clearing services . . . available to all banks"); *Jet Courier Servs., Inc. v. Fed. Reserve Bank of Atlanta*, 713 F.2d 1221, 1222-23 (6th Cir. 1983) (stating that the 1980 Deregulation and Monetary Control Act made Federal Reserve services "available to all banks"). The Federal Reserve Bank of Kansas City argues that these interpretations appeared in dicta. But dicta or not, these interpretations support open access to Federal Reserve services. By contrast, no federal court has interpreted the statute as the Federal Reserve Bank of Kansas City and the Board of Governors do.

Academics have agreed with our sister circuits, interpreting § 248a(c)(2) to entitle all depository institutions to Federal Reserve services. *See, e.g.*, Timothy K. Armstrong, Chevron *Deference and Agency Self-Interest*, 13 Cornell J.L. & Pub. Pol'y 203, 231 n.148 (2004) ("[T]he [1980 Deregulation and Monetary Control Act] requires all services to be . . . made available to all depository institutions on equal terms."); Thomas C. Baxter, Jr. & James H. Freis, Jr., *Fostering Competition in Financial Services: From Domestic Supervision to Global Standards*, 34 New Eng. L. Rev. 57, 70 (1999) ("The Federal Reserve Banks are required by the [1980 Deregulation and Monetary Control Act] to provide all domestic depository institutions, including U.S. branches of foreign banks, with payments services ranging from currency and check collection to wire transfer and securities settlement." (footnote omitted)); Fred H. Miller, Robert G.

Ballen, & Hal S. Scott, *Commercial Paper, Bank Deposits and Collections, and Commercial Electronic Fund Transfers*, 39 Bus. Law. 1333, 1365 (1984) ("The [1980 Deregulation and Monetary Control Act] . . . required the Federal Reserve, for the first time, to provide access to virtually all of its services to all depositary institutions on the same terms and conditions, and to charge for such services."). These interpretations of § 248a(c)(2) support the widespread recognition that all nonmember depository institutions are entitled to Federal Reserve services.

## 2.    Section 342

The Federal Reserve Bank of Kansas City and the Board of Governors contend that 12 U.S.C. § 342 creates discretion on whether to issue a master account. This interpretation conflicts with (1) the statutory text and (2) Supreme Court precedent interpreting an older, virtually identical version of § 342.

Section 342 reads:

> Any Federal Reserve bank *may* receive from any of its member banks, or other depository institutions, and from the United States, deposits of current funds in lawful money, national-bank notes, Federal reserve notes, or checks, and drafts, payable upon presentation or other items and also, for collection, maturing notes and bills . . . .

12 U.S.C. § 342 (emphasis added).

Unlike § 248a(c)(2), § 342 is not a congressional command. The use of "may" in § 342 indicates that Federal Reserve Banks have discretion. *Jama v. Immigration & Customs Enf't*, 543 U.S. 335, 346 (2005) ("The

word 'may' customarily connotes discretion."). But this discretion does not encompass the issuance of master accounts.

Section 342 addresses the types of monetary instruments that Federal Reserve Banks may receive for deposit or collection. *See Farmers' & Merchants' Bank of Monroe v. Fed. Reserve Bank of Richmond*, 262 U.S. 649, 662 (1923) ("But neither section 13, nor any other provision of the Federal Reserve Act, imposes upon reserve banks any obligation to receive checks for collection. The act merely confers authority to do so."). But § 342 does not address which institutions can access Federal Reserve services; that subject is governed instead by § 248a(c)(2), which establishes open access to Federal Reserve services for all nonmember depository institutions. As a result, § 342 does not affect Fourth Corner's entitlement to a master account.

* * *

Presenting an alternative ground to affirm, the Federal Reserve Bank of Kansas City argues that Fourth Corner is not entitled to a master account. I disagree. Under § 248a(c)(2), Fourth Corner is entitled to a master account based on § 248a(c)(2)'s plain text, past and present interpretations (outside of this litigation) by the Board of Governors, interpretations by officials of regional Federal Reserve Banks, legislative history, and interpretations by other courts and academics.

24

## V.   The Effect of Partial Preemption

The Federal Reserve Bank of Kansas City also invokes obstacle preemption,[9] contending that Fourth Corner's charter is preempted because it poses an obstacle to Congress's goals under the Controlled Substances Act. According to the Federal Reserve Bank of Kansas City, this preemption forecloses Fourth Corner's right to operate a credit union. I disagree.

Colorado granted Fourth Corner a charter, which is a one-page, boilerplate document that authorizes Fourth Corner "to conduct business pursuant to all of the powers conferred upon it by law." Appellant's App'x at 224.[10] The charter does not mention marijuana.

Nonetheless, the Federal Reserve Bank of Kansas City invokes obstacle preemption based on a four-step argument:

1.    Fourth Corner's application for a charter signaled an intent to service marijuana-related businesses.

---

[9]    Obstacle preemption exists "where 'under the circumstances of [a] particular case, [the challenged state law] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372-73 (2000) (alterations in original) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

[10]    We can consider the charter because Fourth Corner quoted from the charter in the amended complaint and the charter is central to Fourth Corner's claim. *See GFF Corp. v. Associated Wholesale Grocers*, 130 F.3d 1381, 1384 (10th Cir. 1997).

2.    Colorado therefore issued the charter in order to facilitate violations of federal law.

3.    Because Colorado granted the charter for this purpose, the charter poses an obstacle to the goals underlying the Controlled Substances Act.

4.    Thus, the charter is preempted.

In evaluating this argument, we can make four assumptions favoring the Federal Reserve Bank of Kansas City:

1.    The reason for the charter was to facilitate violations of federal law.

2.    Because Colorado granted the charter for this purpose, the charter authorizes Fourth Corner to violate federal law.

3.    The charter therefore poses an obstacle to Congress's goals under the Controlled Substances Act.

4.    Preemption under the Controlled Substances Act is not limited to impossibility preemption.[11]

_____

[11]    Impossibility preemption exists "where it is impossible for a private party to comply with both state and federal law . . . ." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Some courts have held that preemption under the Controlled Substances Act is limited to impossibility preemption. For instance, in *County of San Diego v. San Diego NORML*, the court stated that

[b]ecause Congress provided that the [Controlled Substances Act] preempted only laws positively conflicting with the [Controlled Substances Act] so that the two sets of laws could not consistently stand together, and omitted any reference to an intent to preempt laws posing an obstacle to the [Controlled Substances Act], we interpret title 21 United States Code section 903 as preempting only those state laws that positively conflict with the [Controlled Substances Act] so that simultaneous compliance with both sets of laws is impossible.

Even with these assumptions, the Federal Reserve Bank of Kansas City's argument would not justify the wholesale denial of a master account.

Under the preemption doctrine, "state law is displaced only 'to the extent that it actually conflicts with federal law.'" *Dalton v. Little Rock Family Planning Servs.*, 516 U.S. 474, 476 (1996) (quoting *Pacific Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 204 (1983)). Thus, "'a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it.'" *Id.* (quoting *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985)); *see also Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dept. of Health*, 699 F.3d 962, 985 (7th Cir. 2012) (applying this principle in the obstacle-preemption context).

Under this principle, Fourth Corner's charter would be preempted only to the extent that it authorizes service of marijuana-related

---

81 Cal. Rptr. 3d 461, 480-81 (Cal. Ct. App. 2008).

The Federal Reserve Bank of Kansas City argues that *County of San Diego* lacks persuasive value because it preceded the Supreme Court's opinion in *Wyeth v. Levine*, 555 U.S. 555 (2009). But *Wyeth* served only to clarify the standard for obstacle preemption in the context of drug-labeling regulation and state tort suits; *Wyeth* did not address whether the Controlled Substances Act can preempt state law under an obstacle-preemption theory. Nonetheless, we can assume for the sake of argument that preemption under the Controlled Substances Act is not limited to impossibility preemption.

businesses. Thus, Fourth Corner would still be authorized to pursue its broader mission of servicing the supporters of legalization.

Because the charter would not be completely invalidated, Fourth Corner would remain entitled to a master account. Therefore, I would reject the Federal Reserve Bank of Kansas City's argument on obstacle preemption. Rejecting this argument, I would reverse the dismissal.

## VI.   Prudential Ripeness

Judge Matheson concludes that the appeal is prudentially unripe because (1) the Federal Reserve Bank of Kansas City might grant a master account upon a new application with the assurances that Fourth Corner has made in court proceedings and (2) postponement of judicial review would not cause Fourth Corner a significant hardship. I disagree in light of the amended complaint and the parties' representations to the district court. Together, they show with relative certainty that (1) the Federal Reserve Bank of Kansas City will refuse to provide a master account even with an unambiguous promise by Fourth Corner to refrain from servicing marijuana-related businesses and (2) dismissal would result in significant hardship for Fourth Corner, preventing it from accessing basic Federal Reserve services for *any* patrons.[12]

---

[12]    As Judge Moritz states, Fourth Corner represented that it had tried and failed to obtain a correspondent relationship with another financial institution that had a master account. Op. of Judge Moritz at 4 n.2.

## A.    The Doctrine of Prudential Ripeness

"The ripeness doctrine aims to prevent courts 'from entangling themselves in abstract disagreements' by avoiding 'premature adjudication.'" *Awad v. Ziriax*, 670 F.3d 1111, 1124 (10th Cir. 2012) (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)). Ripeness stems not only from Article III of the Constitution but also from prudential considerations. *Id.* In applying these prudential considerations, we consider "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *United States v. White*, 244 F.3d 1199, 1202 (10th Cir. 2001) (quoting *Abbott Labs.*, 387 U.S. at 149).

## B.    Until we ordered supplemental briefing on prudential ripeness, the parties had never raised this issue.

Roughly six months after oral argument, the panel ordered supplemental briefing on whether we should consider prudential ripeness sua sponte. Prior to this order, the parties had never mentioned a concern about prudential ripeness.

As Judge Matheson states, we have the power to raise the issue sua sponte. *See Nat'l Park Hosp. Ass'n v. Dep't. of Interior*, 538 U.S. 803, 808 (2003) ("[E]ven in a case raising only prudential concerns, the question of

ripeness may be considered on a court's own motion.").[13] But having this power does not mean that we should exercise it. And even if we were to consider the issue sua sponte, we would have little reason to regard the case as unripe.

## C.    Fitness of the Issue for a Judicial Decision

As discussed above, the first factor involves fitness of the issue for a judicial decision. *See* Part VI(A), above. Here the issue involves the sufficiency of the complaint. In my view, this issue is fit for a judicial decision.

In assessing fitness for a judicial decision, we focus on whether adjudication of this issue would turn on purely legal issues or would instead require facts that may not be sufficiently developed. *See Kan. Judicial Rev. v. Stout*, 519 F.3d 1107, 1118 (10th Cir. 2008). The sufficiency of a complaint is a question of law, and that question of law is not "fact-based." *See Carabajal v. City of Cheyenne*, 847 F.3d 1203, 1212 (10th Cir. 2017) (stating that "the sufficiency of a complaint is a question

---

[13]    The U.S. Supreme Court has indicated that the prudential-ripeness doctrine lies in tension with federal courts' virtually unflagging obligation to hear and decide cases within their jurisdiction. *Susan B. Anthony List*, ___ U.S. ___, 134 S. Ct. 2334, 2347 (2014); *see Lexmark Int'l, Inc. v. Static Control Components, Inc.*, ___ U.S. ___, 134 S. Ct. 1377, 1386 (2014) (indicating that tension exists between prudential requirements and the federal courts' obligation to hear and decide cases when jurisdiction exists); *see also Reddy v. Foster*, 845 F.3d 493, 501 n.6 (1st Cir. 2017) (stating that in *Susan B. Anthony List*, the Supreme Court "cast a measure of doubt upon ripeness's prudential dimensions").

30

of law"); *Ashcraft v. Iqbal*, 556 U.S. 662, 674 (2009) ("Evaluating the sufficiency of a complaint is not a 'fact-based' question of law . . . ."). The sufficiency of a complaint does not turn on facts in the real world; instead, the sufficiency of a complaint turns solely on its allegations. Those allegations must be credited regardless of what is happening in the real world. *See* Part I, above. Thus, further factual development would not help us decide the sufficiency of Fourth Corner's amended complaint. This complaint is either sufficient or not to state a valid claim.[14]

---

[14]    Judge Matheson states that "we have found claims, and sometimes entire cases, unripe at the motion-to-dismiss stage." Op. of Judge Matheson at 5. For this statement, he cites two of our opinions. But neither opinion questioned the ripeness of an action when the appellate issue involved the sufficiency of a complaint for purposes of a motion to dismiss.

In the first case, *Southern Utah Wilderness Alliance v. Palma*, the district court ordered dismissal based on a lack of standing rather than insufficiency of the complaint. *See S. Utah Wilderness All.*, 707 F.3d 1143, 1147 (10th Cir. 2013). In light of the reliance on standing, the district court explained that it was basing the dismissal on Rule 12(b)(1) (which involves subject-matter jurisdiction) rather than Rule 12(b)(6). *S. Utah Wilderness All. v. Palma*, No. 2:07-CV-00199-CW, 2011 WL 2565198, at *2 (D. Utah Apr. 4, 2011) (unpublished), *aff'd & remanded*, 707 F.3d 1143 (10th Cir. 2013). On appeal, we affirmed the dismissal, but held that the case was not ripe for review. *S. Utah Wilderness All.*, 707 F.3d at 1147.

In the second case, *Salt Lake Tribune Publishing Co. v. Management Planning, Inc.*, the district court addressed motions based on ripeness (Rule 12(b)(1)) and failure to state a valid claim (Rule 12(b)(6)). *Salt Lake Tribune Pub. Co. v. Mgmt. Planning, Inc.*, No. 2:03-CV-565 TC, 2005 WL 2739148, at *4 (D. Utah Oct. 24, 2005) (unpublished), *rev'd & remanded*, 454 F.3d 1128 (10th Cir. 2006). In ruling on these motions, the district court dismissed some claims on the ground that they were unripe. *Salt Lake*

Two of the three members of the panel conclude that we have enough information to decide the sufficiency of the amended complaint: I have concluded that we have enough information to reverse, and Judge Moritz has elsewhere concluded that we have enough information to affirm. Though we differ in our conclusions, we share a belief that we have enough information to decide whether the amended complaint is sufficient under Rule 12(b)(6).

Judge Matheson states that "[t]he ripeness problem here is not the product of a pleading defect," but stems instead "from a lack of developed facts." Op. of Judge Matheson at 3 n.2. Essentially, Judge Matheson expresses uncertainty over whether a concrete dispute remains between the parties. His concern stems from one allegedly missing piece of information: What would happen if Fourth Corner makes a promise to the Federal Reserve Bank of Kansas City to service marijuana-related businesses only if doing so is legal? But we already know with relative

---

*Tribune Publ'g Co.*, 454 F.3d at 1140-41. On appeal, we held that only one of those claims was unripe. *Id.* at 1141. We did not deem any other claims unripe.

As these opinions indicate, we have upheld dismissals by finding cases or claims unripe under the general ripeness doctrine discussed in *Abbott Labs. v. Gardner*, 387 U.S. 136 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). But none of our published opinions have deemed a case or claim unripe under this doctrine when the district court had based dismissal on insufficiency of the complaint. Neither has the Supreme Court.

32

certainty that this promise would not make any difference to the Bank. Thus, this piece of information is not missing.

The Federal Reserve Bank of Kansas City provided Fourth Corner with eight reasons for denying the master account; Fourth Corner's desire to service marijuana-related businesses was only one of the reasons. *See* note 2, above. The importance of the other reasons became readily apparent in the hearing on the motion to dismiss. There the district court discussed those reasons with an attorney for the Federal Reserve Bank of Kansas City. In this discussion, the district court questioned the Federal Reserve Bank of Kansas City about whether it would be willing to provide a master account if Fourth Corner agreed not to service marijuana-related businesses "unless and until there's congressional action that says they can." Appellant's App'x at 656. The attorney responded: "I seriously doubt it would make a difference . . . . I think it's important to recall that there were eight reasons that were given . . . for denying the account." *Id.*

The district court sought clarification on whether the attorney knew whether his client would take issue with granting a master account even if Fourth Corner agreed not to service marijuana-related businesses absent congressional authorization. *Id.* at 658. The attorney responded: "I know that my client feels very strongly about the other reasons that were given for denying the master account to [Fourth Corner]." *Id.*; *see also id.* at 660-61 ("I can't stand here and say, if we carve out the marijuana-related

businesses, that solves the problems, because there are other very serious issues that the bank has to take into consideration in deciding whether or not to grant a master account.").

The district court pressed further, instructing the attorney to identify the "reasons . . . [that were] so important that [Fourth Corner] can't even serve the [legalization supporters]." *Id.* at 658. The attorney gave three reasons. The first was a lack of insurance for depositors. The attorney characterized the lack of insurance as "a very important reason." *Id.* at 662. The attorney's second reason was that Fourth Corner was a "[d]e novo [financial] institution," meaning that Fourth Corner had "no operational track record to demonstrate that it [could] . . . carry the financial load of maintaining a master account." *Id.* at 658 (italics in original). The attorney noted that the Federal Reserve Bank of Kansas City "believes it is very important that they don't give master accounts to *de novo* institutions." *Id.* at 665 (italics in original). The attorney's third reason involved Fourth Corner's lack of capital, described as a problem inherent to new credit unions. *Id.* at 662. According to the attorney, this lack of capital "creates an operational problem because you have to have money to kind of run the operation while it's getting up and running." *Id.*

At oral argument and in supplemental briefing, the Federal Reserve Bank of Kansas City retreated, indicating that it might grant a master account if Fourth Corner submitted a new application and promised not to

34

service marijuana-related businesses. I find this eleventh-hour reversal unpersuasive.

In both district court and our court, Fourth Corner has promised to service marijuana-related businesses only if such service is legal. In the face of these assurances, the Federal Reserve Bank of Kansas City has continued to resist granting a master account to Fourth Corner. In light of this continued resistance, we know with relative certainty that the Federal Reserve Bank of Kansas City will continue to refuse a master account even if Fourth Corner reiterates the promises that it has made in district court and in our court. In these circumstances, the sufficiency of the amended complaint is fit for a judicial decision.

### D.     Fourth Corner's Hardship

Dismissal based on prudential ripeness would foist a substantial hardship on Fourth Corner, and the Federal Reserve Bank of Kansas City does not suggest otherwise. For example, during the delay caused by a dismissal, Fourth Corner will remain unable to access any Federal Reserve services. As a result, Fourth Corner will remain unable to conduct any business, even with members of social groups supporting the legalization of marijuana. *See Neb. Pub. Power Dist. v. MidAmerican Energy Co.*, 234 F.3d 1032, 1039 (8th Cir. 2000) (indicating that in analyzing hardship, courts may examine the impact of delayed judicial resolution on the parties' "ability to plan and to conduct business operations").

35

### E.     Judge Matheson's Proposed Requirement for Restarting this Litigation

This hardship would be magnified under Judge Matheson's approach. Under his approach, Fourth Corner would need to submit a new application to the Federal Reserve Bank of Kansas City. This application would consist of not only the same materials that Fourth Corner has already submitted, but also a conditional promise that Fourth Corner would service marijuana-related businesses only if doing so is legal.

This conditional promise is the same one that already appears in the amended complaint and that has been reiterated in oral argument in both district court and our court. For four reasons, it would be inappropriate to force Fourth Corner to follow Judge Matheson's proposed requirement.

First, it is undisputed that the application for a master account does not include any information about the applicant's business plan. In making this conditional promise, Fourth Corner would be sharing information about its business plan with the Federal Reserve Bank of Kansas City. We should hesitate to prohibit Fourth Corner (sua sponte) from going to court until it does something that apparently deviates from the existing procedure to obtain a master account.

Second, Fourth Corner has already made this conditional promise in district court and in our court. What further is to be gained from making this promise directly to the Federal Reserve Bank of Kansas City? If this

36

conditional promise were going to sway the Federal Reserve Bank of Kansas City, the Bank would already have issued a master account. Nothing is stopping the Bank from issuing the master account based on the conditional promise that has already been made in district court and in our court.

Third, our decision today will apparently eliminate any possibility that Fourth Corner would use a master account to service marijuana-related businesses. In the amended complaint, Fourth Corner explained that it has always intended to service marijuana-related businesses only if doing so is legal. Today, two of the three panel members hold that servicing marijuana-related businesses remains illegal under federal law.

With this holding by a panel majority, Fourth Corner will know that servicing marijuana-related businesses is illegal. *See Webbe v. Commissioner*, 902 F.2d 688, 689 (8th Cir. 1990) (discussing the weight accorded to a concurrence joined by a panel majority). Therefore, we have no reason to believe that Fourth Corner would intend to service marijuana-related businesses after today's issuance of our opinions. Indeed, in district court and in our court, Fourth Corner expressly promised not to service marijuana-related businesses upon a pronouncement like the one we make today. As a result, it would make little sense for Fourth Corner to approach the Federal Reserve Bank of Kansas City and promise to service marijuana-related businesses only if such service is legal.

37

Fourth, imposing this requirement on Fourth Corner would magnify the hardship arising out of this dismissal. Even if Fourth Corner immediately approaches the Federal Reserve Bank of Kansas City and promises not to service marijuana-related businesses, months may pass before a decision is made on whether to grant the master account. The amended complaint details the considerable delay that has already taken place, with Fourth Corner waiting roughly nine months before it learned that it would not get a master account. During the newly created delay, Fourth Corner would be paralyzed, unable to litigate the right to a master account or to obtain services that are indispensable for a credit union.

For these four reasons, we should decline to require Fourth Corner to again request a master account with a promise apparently going beyond existing procedures.

## VII.  Conclusion

The district court dismissed the amended complaint, reasoning that Fourth Corner would use the master account to violate federal drug laws. This ruling was erroneous. The district court should have presumed that Fourth Corner would follow the court's determination that servicing marijuana-related businesses is illegal. And in the amended complaint, Fourth Corner essentially promised to obey the law that would be set out in the eventual declaratory judgment. In these circumstances, the district

court had little reason to jettison the standard on a motion to dismiss and rely instead on suspicions about what Fourth Corner would do.

The Federal Reserve Bank of Kansas City makes two alternative arguments to affirm.

First, the Bank contends that financial institutions lack a right to a master account. I would reject this contention based on § 248a(c)(2)'s text, the consensus of persuasive interpretations, and legislative history.

Second, the Federal Reserve Bank of Kansas City invokes obstacle preemption, arguing that Fourth Corner's charter impedes Congress in achieving its objectives under the Controlled Substances Act. But at most, the charter would be preempted only to the extent that it authorizes Fourth Corner to service marijuana-related businesses. Fourth Corner would still be authorized to service supporters of the legalization of marijuana. Thus, regardless of whether the charter is partially preempted, Fourth Corner would be entitled to a master account. As a result, I would reverse the dismissal.

Judge Matheson concludes that dismissal is appropriate on prudential-ripeness grounds. I respectfully disagree. This appeal is fit for a judicial decision, and dismissal would hurl a significant, unwarranted hardship on Fourth Corner.